UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOOTH FAMILY TRUST, on Behalf of Itself and All Others Similarly Situated, | § § § | No. |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| | § | COMPLAINT FOR BREACH OF |
| v. | § § | FIDUCIARY DUTIES AND VIOLATIONS OF §14(a) AND §20(a) OF THE SECURITIES |
| PRIDE INTERNATIONAL, INC., LOUIS A. RASPINO, DAVID A. B. BROWN, RALPH D. MCBRIDE, ARCHIE W. DUNHAM, FRANCIS S. KALMAN, KENNETH M. BURKE, ROBERT G. PHILLIPS, DAVID A. HAGER, ENSCO PLC, ENSCO INTERNATIONAL INCORPORATED, and ENSCO VENTURES LLC, | § § § § § § § § § § § § | EXCHANGE ACT OF 1934 |
| Defendants. | § § | |
| | § | DEMAND FOR JURY TRIAL |

## SUMMARY OF THE ACTION

1.      Plaintiff brings this shareholder class action both for itself and on behalf of all similarly situated holders of common stock of Pride International, Inc. ("Pride" or the "Company") against Pride, certain of its officers and directors, Ensco plc ("Ensco"), ENSCO Ventures LLC ("ENSCO Ventures"), and ENSCO International Incorporated ("ENSCO International").  This action arises out of defendants' violations of state law and §14(a) and §20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with their attempts to sell Pride via an unfair process to Ensco for $41.60 per share (the "Proposed Acquisition").  Under the terms of the Proposed Acquisition, Pride stockholders will receive 0.4778 newly-issued shares of Ensco plus $15.60 in cash for each share of Pride common stock.  Further, as part of their efforts to seek shareholder approval of the Proposed Acquisition, the defendants have filed with the SEC a false and materially misleading Form S-4 Registration Statement (the "S-4").

2.      In pursuing the unlawful plan to sell the Company via an unfair process and at an unfair price, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, good faith, and fair dealing. This action seeks to enjoin the Individual Defendants, as defined herein, from further breaching their fiduciary duties in their pursuit of a sale of the Company and from seeking shareholder approval of the Proposed Acquisition without disclosing all material information to Pride shareholders in violation of §14(a) and §20(a) of the Exchange Act.

3.      Pride is one of the world's largest offshore drilling contractors.  The Company's customers include major integrated oil and natural gas companies, state-owned national oil companies, and independent oil and natural gas companies.  Pride provides these contract drilling services through the use of mobile offshore drilling rigs in the U.S. and international waters.

4.      Despite the Company's improving results and long-term prospects, the Individual Defendants (as defined herein) are desperate to sell now.  All of the Individual Defendants face significant liability from a shareholder derivative action pending against them.  They are attempting

- 1 -

to extinguish that liability by cashing out Pride's shareholders to their detriment.  As an added benefit, certain Individual Defendants are receiving prestigious and lucrative positions in the post-Proposed Acquisition company, including roles as executives and directors with the go-forward company.

5.     In order to ensure that the Proposed Acquisition is completed, the Individual Defendants agreed to a number of preclusive and draconian deal protection devices in the Agreement and Plan of Merger, dated February 6, 2011 (the "Merger Agreement").  In particular, the Individual Defendants agreed to: (i) a provision that requires the Company to pay Ensco a termination fee of $260 million in order to enter into a transaction with a superior bidder; (ii) a no-solicitation clause that prevents the Company from soliciting other potential acquirors or even continuing discussions and negotiations with potential acquirors; and (iii) "matching rights", which grants Ensco three business days to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid no longer constitutes a superior proposal.

6.     In an attempt to secure shareholder approval for the unfair Proposed Acquisition, on March 3, 2011, the Individual Defendants, Pride, and Ensco issued a materially false and misleading S-4.  The S-4, which recommends that Pride shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company.  Among other information, the S-4 omits and/or misrepresents the following material information in contravention of §14(a) and §20(a) of the Exchange Act regarding:

(a)     the fairness opinions provided by Ensco's financial advisors, Deutsche Bank Securities Inc. ("Deutsche Bank"), and Pride's financial advisors, Goldman, Sachs & Co. ("Goldman Sachs"), including the data and inputs underlying their fairness analyses; and

(b)     the sales process, including the reasons why the Board of Directors (the "Board") didn't pursue strategic alternatives with other interested companies.

7.     As explained herein, the foregoing information is material to the impending decision of Pride's shareholders whether or not to vote in favor of the Proposed Acquisition.  As such,

defendants' violations of §14(a) and §20(a) of the Exchange Act threaten shareholders with irreparable harm for which money damages are not an adequate remedy.  Thus, plaintiff seeks injunctive relief to ensure that defendants cure their violations of fiduciary duty and §14(a) and §20(a) before Pride's shareholders are asked to vote on the Proposed Acquisition.

8.      To remedy defendants' breaches of fiduciary duties and other misconduct, plaintiff seeks, inter alia: (i) injunctive relief preventing consummation of the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain a transaction that provides the best possible terms for shareholders and unless and until defendants disclose all material information concerning the Proposed Acquisition to Pride shareholders; (ii) a directive to the Individual Defendants (as defined herein) to exercise their fiduciary duties to obtain a transaction which is in the best interests of Pride's shareholders; and (iii) rescission of, to the extent already implemented, the Proposed Acquisition's Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over all claims asserted herein pursuant to §27 of the Exchange Act for violations of §14(a) and §20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

10.     Venue is proper in this District because Pride has its principle place of business in this District.  Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

11.     Plaintiff Booth Family Trust is a current shareholder of Pride.

12.     Defendant Pride is a Delaware corporation and one of the world's largest offshore drilling contractors operating a fleet of twenty-six mobile offshore drilling units that primarily

provide deepwater drilling programs and services around the globe. Pride has one of the youngest and most technologically advanced deepwater drilling fleets in the offshore industry, with five deepwater drillships, twelve semisubmersible rigs, seven independent leg jackups, and two managed deepwater drilling rigs. Pride's customers include major integrated oil and natural gas companies, state-owned national oil companies, and independent oil and natural gas companies, and its floating rig fleet operates primarily off the shores of Brazil and West Africa. Upon completion of the Proposed Acquisition, Pride will become an indirect, wholly-owned subsidiary of Ensco. Pride's principal executive offices are located at 5847 San Felipe, Suite 3300, Houston, Texas.

13.     Defendant Louis A. Raspino ("Raspino") is Pride's President, Chief Executive Officer ("CEO"), and a director and has been since June 2005. Raspino was Pride's Executive Vice President and Chief Financial Officer ("CFO") from December 2003 to June 2005. Defendant Raspino is a defendant in the shareholder derivative action.

14.     Defendant David A. B. Brown ("Brown") is Pride's Chairman of the Board and has been since May 2005 and a director and has been since September 2001. Defendant Brown is a defendant in the shareholder derivative action.

15.     Defendant Ralph D. McBride ("McBride") is a Pride director and has been since September 1995. Defendant McBride is a defendant in the shareholder derivative action.

16.     Defendant Archie W. Dunham ("Dunham") is a Pride director and has been since May 2005. Defendant Dunham is a defendant in the shareholder derivative action.

17.     Defendant Francis S. Kalman ("Kalman") is a Pride director and has been since October 2005. Defendant Kalman is a defendant in the shareholder derivative action.

18.     Defendant Kenneth M. Burke ("Burke") is a Pride director and has been since December 2006. Defendant Burke is a defendant in the shareholder derivative action.

19.     Defendant Robert G. Phillips ("Phillips") is a Pride director and has been since October 2007. Defendant Phillips is a defendant in the shareholder derivative action.

20.     Defendant David A. Hager ("Hager") is a Pride director and has been since February 2008. Defendant Hager is a defendant in the shareholder derivative action.

- 4 -

21.     Defendant Ensco is a public limited company organized under the laws of England and Wales that provides offshore contract drilling services to the international oil and gas industry through a fleet of five ultra-deepwater semisubmersible rigs, forty jackup rigs, and one barge rig. Ensco's operations are concentrated in Asia Pacific, Europe, Africa, and North and South America. Ensco's principal executive offices are located at 6 Chesterfield Gardens, London, England.

22.     Defendant ENSCO International is a Delaware corporation and an indirect, wholly-owned subsidiary of Ensco.

23.     Defendant ENSCO Ventures is a Delaware limited liability company and an indirect, wholly-owned subsidiary of Ensco.  Upon completion of the Proposed Acquisition, ENSCO Ventures will merge with and into Pride and will cease its separate existence.

24.     The defendants named above in ¶¶13-20 are collectively referred to herein as the "Individual Defendants."

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

25.     Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in a change in corporate control, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, including a significant control premium.  This duty arises in at least the following three circumstances: (i) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (ii) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (iii) when approval of a transaction results in a sale or change of control.  To diligently comply with these duties, neither the directors nor the officers may take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

- 5 -

(d)      will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)      will provide the directors and/or officers with preferential treatment or benefits at the expense of, or which are not shared equally with, the public shareholders.

26.      In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and officers of Pride, are obligated under Delaware law to refrain from:

(a)      participating in any transaction where the directors' or officers' loyalties are divided;

(b)      participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and

(c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

27.      The Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, and have aided and abetted such breaches, including their duties of loyalty, good faith, and due care owed to plaintiff and the other public shareholders of Pride.  Individual Defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits not shared equally by Pride's public shareholders generally.  As a result of the Individual Defendants' self-dealing and divided loyalties, neither plaintiff nor the Class (as defined herein) will receive adequate or fair value for their Pride common stock in the Proposed Acquisition.

28.      The Individual Defendants have knowingly or recklessly breached their duties of loyalty, good faith, and due care in connection with the Proposed Acquisition.  As such, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

## BACKGROUND

29.     Pride is one of the world's largest offshore drilling contractors. As of November 3, 2010, the Company operated a fleet of twenty-five rigs, consisting of four deepwater drillships, twelve semisubmersible rigs, seven independent leg jackups and two managed deepwater drilling rigs. As of that date, the Company also has two deepwater drillships under construction, expected to be completed in the first and fourth quarters of 2011.  The Company has operations in Houston, Texas and in Angola, Brazil, France, and several additional international locations.  Their customers include major integrated oil and natural gas companies, state-owned national oil companies and independent oil and natural gas companies.

30.     A recent study by professional services firm Deloitte titled the "Oil and Gas Reality Check: 2011," released in early December 2010, found that, while insurance premiums and financing may be more expensive for deepwater projects following the Deepwater Horizon incident, countries remain eager to green light projects.  "As many nations struggle to boost their domestic supplies of oil and gas, they are likely to give the go-ahead for more deepwater exploration and production even in light of recent events," the report said. "It is no wonder then that producers are still pursuing deepwater opportunities with zeal."

31.     To capitalize on the expected future growth in opportunities in deepwater drilling, Pride has recently made a significant investment to expand its deepwater fleet.  Specifically, on December 14, 2010, the Company announced that it had reached an agreement with Samsung Heavy Industries, Ltd. (SHI) for the construction of a fifth ultra-deepwater drillship, further expanding the Company's ultra-deepwater fleet size and drilling capabilities.  The drillship is expected to be completed by 2013.  As stated by defendant Raspino in the press release announcing the investment:

> The long-term outlook for the deepwater drilling sector is expected to remain fundamentally strong, supported by a continuation of record geologic success, increased expansion by clients into new emerging locations, growing preference by many clients for the industry's most advanced, efficient and safe drilling rigs, a continuing shift toward field development programs, new technologies that improve the recovery rates from deepwater reservoirs and an environment of sustainable crude oil prices that is supported by growth among numerous global economies. Given the long-term visibility afforded by these sector attributes, we are increasingly

confident that additional deepwater capacity will be required by our clients as we advance through the next decade.

## THE DERIVATIVE ACTIONS

32.     All of the Individual Defendants are defendants in two shareholder derivative actions styled *Dixon v. Brown, et. al.*, and *Ferguson v. Raspino, et. al.*, which are currently pending in the District Court of Harris County, Texas.  The shareholder derivative actions allege claims for breach of fiduciary duties against the Individual Defendants for violations of the duty of loyalty and good faith that are related to violations of the Foreign Corrupt Practices Act ("FCPA").  As they contemplated the personal liability and massive exposure they faced as a result of the FCPA violations, SEC investigation, and shareholder suits, Pride's officers and directors realized that they had an opportunity to potentially insulate themselves from that liability.  Specifically, defendants hoped that, through a merger, they could find a deeper pocket to indemnify themselves while at the same time potentially eliminating the derivative lawsuits that were pending against them.  Thus, rather than freely negotiate alternatives for Pride by emphasizing the Company's attractive investment opportunities, defendants protected their own interests by focusing on a fire sale of Pride to shield themselves from liability.

## THE FLAWED SALE PROCESS

33.     Since as early as 2005, Pride had ongoing discussions with Seadrill Limited ("Seadrill").  Seadrill's showed a consistent interest in a business combination between the companies.  In addition to Seadrill, a number of other competitors were interested in acquiring Pride, including Ensco and companies the S-4 termed Company A, Company B, and Company C.  Ensco initially showed interest in Pride in April of 2008.

34.     Pride's and Seadrill's discussions over the years were sometimes general and at other times more formal.  In September 2010, discussions between Seadrill and Pride heated up again.  In September 2010, Seadrill requested that any combination retain Seadrill's financial strategy.

35.     At a December 10, 2010 Board meeting, Pride's Board discussed business combinations with Seadrill, Ensco, Company A, Company B, and Company C, but only directed

management to discuss a potential acquisition with Seadrill and Ensco.  From there forward, the S-4 does not describe any meaningful steps taken by the Board or management to solicit or further explore the offers from Company A, Company B, or Company C.

36.     On December 18, 2010, Ensco and Pride entered into a confidentiality agreement that would provide Ensco access to information not provided to other potential acquirers.  This gave Ensco an advantage over those other suitors who were interested in acquiring the Company.

37.     On December 20, 2010, the CEO of Company A reached out to Pride's CEO through a letter expressing an interest in a possible strategic combination.  Despite this overt act, the S-4 fails to describe what, if any, response the Board had to this letter.

38.     Shortly after the letter from Company A, on December 22, 2010, Pride allowed Ensco to begin conducting due diligence.  Both Ensco and Pride established virtual data rooms to allow each party access to non-public information that was not presently being shared with other potential suitors.  In fact, no data room would be provided to any of the other interested suitors.  This provided Ensco with a superior position and access to material, corporate information that no other suitor had the time to examine in order to make their best possible offer.

39.     Just eight days after having access to the data room containing non-public information, Ensco's board of directors authorized a letter of interest to Pride indicating that Ensco was willing to acquire the Company for $39.00 per share, with a mix of 35% cash and 65% Ensco shares.  This offer contemplated board of directors' seats at the combined company for one or two Pride directors.  The letter was sent by Daniel W. Rabun ("Rabun"), the chairman of the board of directors and CEO of Ensco.

40.     On January 6, 2011, Rabun and defendant Raspino discussed the letter and the Board's reaction, which defendant Raspino characterized as "favorable."  Rabun and defendant Raspino also discussed composition of the board of directors at the combined company as well as the financial terms of the offer.

41.     On January 10, 2011, Seadrill informed the Company that it was willing to conduct mutual due diligence.  Seadrill and Pride then exchanged due diligence request lists with one

another.  However, before any meaningful due diligence could take place, on January 16, 2011, Pride's counsel received a draft of a proposed merger agreement from Ensco.

42.  On January 18, 2011, an unnamed stockholder of Pride informed the Company that it would make a Hart Scott Robino filing with respect to Pride and make a proposal to elect a group of directors nominated by the unnamed stockholder.  In late January, Seadrill expressed a continued interest in a transaction and indicated it too had an interest in electing either a director or a group of directors to the board of directors.

43.  Also in late January, Ensco and Pride continued to negotiate the proposed merger agreement, including a no solicitation clause to prevent any other potential suitors from emerging. While these negotiations were ongoing no other suitor was asked to submit a binding or non-binding offer or a merger agreement.

44.  On February 1, 2011, defendant Raspino and Rabun discussed the potential acquisition and pricing issues and board of directors' representation.  The specifics of this meeting were not disclosed in the S-4.  The next day, Pride received due diligence from Seadrill.  However, on February 4, 2011, Ensco increased its cash portion of the consideration by $1.08 to $14.73 and an exchange ratio of 0.4778 Ensco American Depository Shares, for a proposed consideration of $41.00.  The Board informally responded by claiming that they expected a price of $42.00 per share and three board of directors' seats.  In the Board's formal response to Ensco's offer, it  lowered its requested consideration and asked for $41.60 per share and three board seats.

45.  On February 5, 2011, before any due diligence was provided to Seadrill and any further discussions with it occurred, the Ensco board of directors agreed to the $41.60 per share and offered two board of directors' seats on the go-forward company.  The Pride Board agreed. Defendant Raspino and Rabun informed the companies' respective counsel to begin to lock up the Proposed Acquisition.

46.  On February 6, 2011, the Merger Agreement was signed.  Before the Merger Agreement could be announced defendant Raspino received an e-mail from Seadrill's CEO addressing the confidentiality agreement between the companies and Seadrill's continuing interest in

pursuing a transaction with Pride.  The S-4 is silent as to whether defendant Raspino ever responded

to Seadrill's inquiry.

## THE PROPOSED ACQUISITION

47.     On February 7, 2011, Pride issued the following press release announcing that the

Individual Defendants had agreed to sell Pride to Ensco:

LONDON and HOUSTON, TX, Feb 07, 2011 (MARKETWIRE via COMTEX) --
Ensco plc (NYSE: ESV) and Pride International, Inc. (NYSE: PDE) jointly
announced today that they have entered into a definitive merger agreement under
which Ensco will combine with Pride in a cash and stock transaction valued at
$41.60 per share based on Ensco's closing share price on 4 February 2011. The
implied offer price represents a premium of 21% to Pride's closing share price as of
the same date and a premium of 25% to the one month volume weighted average
closing price of Pride. The definitive merger agreement was unanimously approved
by each company's board of directors.

Under the terms of the merger agreement, Pride stockholders will receive 0.4778
newly-issued shares of Ensco plus $15.60 in cash for each share of Pride common
stock. Upon closing, and reflecting the issuance of new Ensco shares, Pride
stockholders collectively will own approximately 38% of Ensco's outstanding shares.

Ensco expects the combined company to realize annual pre-tax expense synergies of
at least $50 million for full year 2012 and beyond. The combination is projected by
Ensco management to be immediately accretive to Ensco earnings and cash flow per
share before synergies.

The transaction will create the second largest offshore driller in the world with 74
rigs spanning all of the strategic, high-growth markets around the globe. The
combined company will have 21 ultra-deepwater and deepwater rigs, forming the
second largest/youngest fleet able to drill in water depths of 4,500 feet or greater. In
addition, the combined company will have more active jackup rigs than any other
driller. Mid-water rigs will represent 8% of the combined fleet.

Based on the closing price of each company's shares on 4 February 2011, the
estimated enterprise value of the combined company is $16 billion. The total
estimated revenue backlog for the combined company is approximately $10 billion.

Strategic Fit

Ensco plc's Chairman, President and Chief Executive Officer, Dan Rabun, stated,
"The combination is an ideal strategic fit, as our rig types, markets, customers and
expertise complement each other with minimal overlap. Pride has gained valuable
expertise building and operating ultra-deepwater semisubmersibles and drillships and
has strong relationships with leading customers in Brazil and West Africa, two of the

- 11 -

fastest-growing deepwater markets in the world. Ensco is a leading provider of premium jackups and ultra-deepwater semisubmersible rigs with a major presence in the North Sea, Southeast Asia, North America and the Middle East. Together, we will form an even stronger company that is ideally positioned to capitalize on growth opportunities within our industry."

Mr. Rabun added, "We share the same core values through our dedication to safety, ethics, operational excellence, employee development, customer satisfaction and disciplined risk management. These values form the foundation of our future growth."

Pride International's President and Chief Executive Officer Louis Raspino added, "The combination of Pride and Ensco creates an offshore contract driller with many of the attributes needed to ensure long-term success in our business. I have always been an advocate of scale, believing that a company with critical mass is afforded numerous benefits, including operational efficiencies, marketing advantages and the ability to attract and retain talented individuals that will help to secure a strong future for our company.

"The diverse composition of the fleet, with significant exposure to high-specification capabilities in both the floating and jackup rig segments, a solid and conservative approach to managing through the complexities of our business, aided by one of the industry's strongest balance sheets and proven leadership that has demonstrated consistent execution and commitment to growth, makes the combination of Pride International and Ensco plc a premier alternative for investors and the driller of choice for our clients.

"Pride stockholders will receive newly-issued Ensco shares that provide them an ongoing interest in a world-class offshore driller with significant growth potential, as well as a cash component, that combined, represents a substantial premium for Pride's shareholders."

Combined Company Highlights

The merger will combine two of the offshore drilling industry's premier companies, combining long and established histories of operational, engineering and technical expertise along with quality assets and infrastructure in a number of the world's prolific offshore drilling basins.

The combined company's fleet will be among the most technologically advanced in the industry and meet the deep- and shallow-water drilling requirements of an expanded base of clients around the world. Within the fleet of 27 floating rigs (semisubmersibles and drillships) are 21 deepwater drilling rigs, including seven rigs delivered since 2008 and another five rigs expected to be delivered between now and 2013, establishing this fleet as among the youngest and most capable in the industry. Thirteen of the rigs are rated for operations in water depths of 7,500 feet and greater.

Also, the combined company's jackup rig fleet, composed of 47 rigs, all with independent leg design, includes 27 units with water depth ratings of 300 feet and greater, with nine units delivered since 2000 and equipped with many of the advanced features requested by clients with shallow water drilling programs, such as increased leg length, expanded cantilever reach and greater hoisting capacity.

The combined company will be among the most geographically diverse drillers with current operations and drilling contracts spanning more than 25 different countries on six continents in nearly every major deep- and shallow-water basin around the world. Regions will include major markets in Southeast Asia, the North Sea, Mediterranean, U.S. Gulf of Mexico, Mexico, Middle East and Australia, as well as the fastest-growing deepwater markets, Brazil and West Africa, where Pride has operated continuously for over 15 years and where some of the world's most prolific geology resides.

Customers will include most of the leading national and international oil companies, plus many independent operators. In total, the combined company will have the second largest number of current customers of any offshore driller and will benefit from enhanced diversification given the minimal overlap between the two companies.

Dan Rabun will remain Chairman, President and CEO and James W. Swent will continue as Senior Vice President and CFO. The remaining executive management team for the combined company will be named at a later date and is expected to be composed of executives from both Ensco and Pride.

Ensco's eight board members will continue to serve as directors of the combined company and two Pride directors will be appointed to an expanded board effective at closing.

The combined company, which will retain the name Ensco plc, will remain domiciled in the UK. Virtually all of the senior executive officers will be located in London. The combined company is anticipated to realize significant benefits similar to those already achieved by Ensco since its redomestication to the UK in 2009. These benefits include greater access to major customers, enhanced oversight of global operations due to improved time zone overlap, increased access to European institutional investors and a more competitive tax position.

Ensco plc American Depositary Shares (ADS) will continue to trade on the New York Stock Exchange under the symbol "ESV."

Transaction Details

Pride shareholders will receive 0.4778 newly-issued Ensco shares plus $15.60 in cash for each Pride common share. The offer results in an implied offer price per diluted share of $41.60 based on Ensco's closing price of $54.41 on 4 February 2011. The offer represents a premium of approximately 21% to Pride's closing price of

- 13 -

$34.39 on 4 February 2011 and a premium of 25% to the one-month volume weighted average closing price of Pride.

Upon closing, Ensco and Pride shareholders will own an estimated 62% and 38%, respectively, of the combined company. The total number of Ensco diluted shares outstanding upon closing will be approximately 229 million.

Financial Highlights

Future revenue growth is anticipated as new opportunities are identified within the expanded customer base. As customers continue to invest in many of the largest and fastest-growing offshore basins, such as Brazil and numerous other emerging locations, new discoveries and development projects are expected to generate substantial additional demand for offshore drilling.

Annual expense savings of at least $50 million are estimated to be realized in full year 2012 and beyond. Expense savings are anticipated from the consolidation of offices that include corporate staff departments, as well as the standardization of systems, policies and procedures across the combined organization.

Ensco management anticipates that the planned combination will be accretive to earnings per share in 2011 and 2012. Excluding transaction-related costs and costs incurred to achieve ongoing expense synergy benefits, earnings per share for full year 2012 for the combined company is projected to be more than 10% accretive to the First Call earnings per share mean estimate of $5.11 for full year 2012 published by Thomson Reuters as of 6 February 2011 for Ensco plc. The 2011 accretion outlook does not include expense synergy benefits. For 2012, approximately $50 million of expense synergy benefits are included in the accretion estimate. The Company anticipates providing an initial full-year 2011 outlook for Ensco on a stand-alone basis during its fourth quarter 2010 earnings conference call scheduled for 24 February 2011.

The transaction will be financed through a combination of existing cash on the balance sheet and newly-issued Ensco shares and debt. Total cash paid to Pride shareholders will be approximately $2.8 billion. Ensco has received commitments from Deutsche Bank Securities, Inc. and Citibank N.A. to finance the incremental debt required for the transaction. Given the number of rigs under construction, it is contemplated that cash flows initially will be dedicated to finance newbuild rigs; however, future cash flows also are expected to be used to pay down debt.

The combined company is expected to have investment-grade ratings and approximately $10 billion in revenue backlog that are expected to support further strategic growth. Long-term debt as a percentage of total capital is anticipated to be approximately 30% following the closing, which is comparable to other investment-grade offshore drillers. The combined company's credit profile will benefit from increased scale and significantly enhanced diversification across markets, rig types,

customers and expertise due to the complementary makeup of the respective businesses.

In connection with the proposed Pride combination, Ensco's board of directors intends to maintain the $0.35 per share quarterly cash dividend ($1.40 per share annualized) following the closing of the transaction.

Conditions and Timing

The transaction is subject to approval by the shareholders of Ensco and Pride, as well as other customary closing conditions. The transaction is not subject to any financing condition. Ensco and Pride intend to file a joint proxy statement/prospectus with the Securities and Exchange Commission as soon as possible. The companies anticipate that the transaction could close as soon as the second quarter of 2011.

48.     Given the growth prospects of the drilling industry and the Company's ability to reap the benefits of the expected growth, the Proposed Acquisition consideration of $41.60 is inadequate and significantly undervalues the Company.  That value represents a premium of just 21% over Pride's closing share price of February 4, 2010.  By comparison, data compiled by *Bloomberg*, shows an average premium of 31% for oil services company acquisitions over the last year.

49.     Under Delaware law, Pride's public shareholders deserve to receive the maximum value for their shares in the Proposed Acquisition.  The consideration reflected in the Proposed Acquisition, however, falls short and does not adequately value the Company's substantial assets.  In exchange for its low-ball offer, Ensco stands to gain Pride's lucrative assets without properly compensating the Company's shareholders and gain control over Pride's assets.

50.     On February 7, 2011, the Company also disclosed the Merger Agreement in a Form 8-K filed with the SEC.  The Form 8-K and Merger Agreement further reveal that the Proposed Acquisition is the result of a flawed process and, unless the offer price is increased, would be consummated at an unfair price.

51.     Under Section 5.2 of the Merger Agreement, Pride is subject to a no-solicitation clause that prohibits the Company from seeking a superior offer for its shareholders.  Section 5.2 states that:

(a) The Company agrees that (i) neither it nor any of its Subsidiaries shall, and it shall not authorize or permit any officers, directors, employees, agents or

- 15 -

representatives of the Company or any of its Subsidiaries (including any investment banker, attorney or accountant retained by it or any of its Subsidiaries) (the "Company Representatives") to, and on becoming aware of it will use its reasonable best efforts to stop such Company Representative from continuing to, directly or indirectly, solicit, initiate or knowingly encourage (including by way of furnishing nonpublic information), or take any action designed to approve, endorse, recommend, or facilitate, directly or indirectly, any inquiry, proposal or offer (including any proposal or offer to its stockholders) with respect to a tender or exchange offer, merger, consolidation, business combination, purchase or similar transaction or series of transactions (other than the transactions contemplated by this Agreement) involving, individually or in the aggregate, 20% or more of the assets, net revenues or net income of the Company and its Subsidiaries on a consolidated basis or 20% or more of any class of the voting securities of the Company, including any merger, consolidation, business combination, purchase or similar transaction in which 20% or more of the Company's voting securities is issued to a third party or its stockholders (any such inquiry, proposal or offer being hereinafter referred to as a "Company Acquisition Proposal"), or cooperate with or assist, participate or engage in any substantive discussions or negotiations concerning a Company Acquisition Proposal, or amend, terminate, waive or fail to enforce, or grant any consent under, any confidentiality, standstill or similar agreement, or resolve to propose or agree to do any of the foregoing; and (ii) it will immediately cease and cause to be terminated any existing negotiations with any parties conducted heretofore with respect to any of the foregoing; provided that (1) nothing contained in this Agreement shall prevent the Company or its Board of Directors from (A) complying with Rule 14e-2 promulgated under the Exchange Act with regard to a Company Acquisition Proposal, (B) prior to the Cutoff Date, providing information (pursuant to a confidentiality agreement in reasonably customary form with terms at least as restrictive in all matters as the Confidentiality Agreement dated December 18, 2010, between Parent and the Company (the "Confidentiality Agreement") (provided that such agreement may allow the counterparty thereto to make a Company Acquisition Proposal to the Company's Board of Directors in connection with the negotiation and discussions permitted by this Section 5.2) and which does not contain terms that prevent the Company from complying with its obligations under this Section 5.2) to or engaging in any negotiations or substantive discussions with any Person who has made an unsolicited bona fide written Company Acquisition Proposal that the Board of Directors of the Company determines in good faith constitutes, or could reasonably be expected to result in, a Company Superior Proposal, to the extent the Board of Directors of the Company, after consultation with its outside legal advisors, determines that the failure to do so would be inconsistent with its fiduciary obligations, or (C) prior to the Cutoff Date, terminating, amending, modifying or waiving any provision of any agreement containing a standstill covenant to the extent permitted pursuant to Section 5.1(s) hereof and (2) notwithstanding anything in this Agreement to the contrary, the Board of Directors of the Company or any committee thereof may make a Company Adverse Recommendation Change in accordance with Section 5.3(d).

52.     The Merger Agreement also provides that the Company must promptly notify Ensco of any unsolicited competing bidder's offer.  Specifically, the Merger Agreement obligates Pride to notify Ensco of any proposals, offers, or any overtures of interest from other potential suitors and it must provide all relevant details of those inquiries or proposals to Ensco, including the identity of the suitor, within 24 hours of receipt.  Section 5.2 of the Merger Agreement states:

> (b) As promptly as practicable after receipt thereof (and in any event within 24 hours), and prior to participating in any substantive discussions or negotiations, the Company will notify Parent orally and in writing of any request for information from any Person that has made a Company Acquisition Proposal (or has indicated to the Company that it is seeking such information in contemplation of making a Company Acquisition Proposal) or the receipt of any Company Acquisition Proposal or any inquiry with respect to a Company Acquisition Proposal, including the identity of the Person or group engaging in such substantive discussions or negotiations, requesting such information or making such Company Acquisition Proposal, and the material terms and conditions of any Company Acquisition Proposal. The Company will (i) keep Parent reasonably informed on a timely basis (and in any event within 24 hours) of the status and material details of any Company Acquisition Proposals, (ii) provide to Parent as soon as practicable (and in any event within 24 hours) after receipt or delivery thereof with copies of all correspondence and other written material sent or provided to the Company from any third party in connection with any Company Acquisition Proposal or sent or provided by the Company to any third party in connection with any Company Acquisition Proposal and (iii) provide or make available to Parent any material nonpublic information concerning the Company or any of its Subsidiaries that is provided to the Person making such Company Acquisition Proposal which was not previously provided or made available to Parent as promptly as practicable (and in any event within 24 hours) after it provides such information to such Person. Any written notice under this Section 5.2 shall be given by facsimile or electronic mail with receipt confirmed or personal delivery. Notwithstanding anything in this Agreement to the contrary, no failure by the Company to comply with any notice or delivery requirement set forth in this Section 5.2 shall constitute a breach of this Section 5.2 unless such failure is intentional or materially prejudicial to Parent.

53.     Thereafter, should the Board determine that the unsolicited offer is superior, Ensco is granted three business days to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid no longer constitutes a superior proposal. Ensco is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, significantly deterring an alternative offer from coming forward.

54.     Pursuant to Section 7.5 of the Merger Agreement, Pride must pay a $260 million termination fee if it receives a superior proposal and changes it recommendation for the Proposed Acquisition.  This provision ensures that no competing offer will be forthcoming.  The $260 million termination fee is 3.53% of the total equity value of the deal and equates to $1.47 per Pride share.

55.     The provisions above, which will serve to unreasonably deter and discourage superior offers from other interested parties, were agreed to by the Individual Defendants to help secure the personal benefits and unfair profits afforded to them through the Proposed Acquisition.  These defendants will reap the spoils of a transaction inherently unfair to the Company's common shareholders, who are falling victim to the unfair process employed and unfair price pondered by the Proposed Acquisition.

## THE MATERIALLY MISLEADING S-4

56.     In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading S-4 on March 3, 2011.  The S-4, which recommends that Pride's shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company. Specifically the S-4 omits/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the Exchange Act.

57.     *Seadrill's requirement that the combined company continue Seadrill's financial strategy*.  The S-4 states on page 53 that as part of the negotiations, Seadrill was requiring that the combined company continue Seadrill's financial strategy after a potential transaction.  This section is materially misleading and omits material information because it does not disclose what that strategy was, whether the Board agreed with it, and how this requirement affected the negotiations.  Without this information the shareholders cannot reasonably consider whether the Proposed Acquisition appropriately values the Company's shares and whether the sales process was legitimate.

58.     *Whether Seadrill was contacted concerning its offer after February 2, 2011*.  The S-4 fails to disclose on page 59 whether Seadrill was ever contacted after February 2, 2011, despite Seadrill's continued interest in a business combination with the Company.  This renders the

description of the sales process materially misleading because it does not disclose information related to the process undertaken prior to entering into the Proposed Acquisition. Without knowing the extent of the discussions, or lack thereof, with Seadrill, shareholders have no way to determine whether a fair process was undertaken before agreeing to the Proposed Acquisition.

59. ***Whether any of the other interested parties were contacted in 2011 before the transaction was agreed to***. The S-4 fails to disclose whether Company A, Company B, or Company C were contacted prior to the execution of the Merger Agreement. This renders the description of the sales process materially misleading because it does not disclose information related to the process undertaken prior to entering into the Proposed Acquisition. Without knowing the extent of the discussions, or lack thereof, with Company A, Company B, and Company C, shareholders have no way to determine whether a fair process was undertaken before agreeing to the Proposed Acquisition.

60. ***The Base Case Financial Forecasts for Pride***. The S-4 fails to disclose the Base Case Financial Forecasts for Pride used by Goldman Sachs. These forecasts represent Pride management's best estimates of the Company's future financial performance. The omission of the forecasts renders it impossible for Pride shareholders to compare the Proposed Acquisition with the Company's prospects should it remain independent, and determine which alternative is more favorable. In addition, without this information, Pride shareholders are unable to independently assess whether Goldman Sachs's analyses set forth in the S-4, which rely on the forecasts, adequately assesses the Proposed Acquisition, and in turn, what weight, if any, to place on Goldman Sachs's fairness opinion.

61. ***The Base Case Financial Forecasts for Ensco***. The S-4 fails to disclose the Base Case Financial Forecasts for Ensco used by Goldman Sachs. These forecasts represent Pride management's best estimates of Ensco's future financial performance. Because a portion of the consideration will be Ensco stock, the omission of this information makes it impossible for Pride shareholders to assess Ensco's prospects going forward. Without this information, Pride shareholders are unable to independently assess whether the consideration they will receive in the

- 19 -

Proposed Acquisition adequately values their shares and provides them with a stake in the combined company that reflects Pride's intrinsic value.

62.     ***The basis for Ensco's estimate of in excess of $50 million in cost savings and operational synergies resulting from the transaction***.  The S-4 fails to disclose the basis for Ensco's prediction of $50 million in cost savings and operational synergies resulting from the transaction. The failure to disclose the basis for the estimates of cost savings and operational synergies prevents shareholders from assessing the adequacy of the consideration they are to receive in the Proposed Acquisition and the prospects of the combined company going forward.

63.     ***Deutsche Bank's Selected Trading Comparables Analysis for Pride and Ensco: summary statistics and observed multiples for each company***.  In the discussion of Deutsche Bank's Selected Trading Comparables Analysis on pages 71 and 72 of the S-4, the S-4 fails to disclose: (i) the summary statistics for the comparable companies; and (ii) the observed multiples for each company used in the Selected Trading Comparables Analysis.  This information is material because without the information set forth above, shareholders are unable to independently assess whether Deutsche Bank's analysis as set forth in the S-4 is an adequate measure of commonly used valuation measurements of the Company compared to the companies that Deutsche Bank selected.

64.     ***Deutsche Bank's Selected Precedent Transactions Analysis: summary statistics and observed multiples for each transaction***.  In the description of Deutsche Bank's Selected Precedent Transactions Analysis on pages 73 and 74 of the S-4, the S-4 fails to disclose: (i) the summary statistics for the comparable transactions; and (ii) the individually observed multiples for each transaction.  Without the information set forth above, shareholders are unable to independently assess whether Deutsche Bank's analysis, as set forth in the S-4, is an adequate measure of this value assessment.

65.     ***Deutsche Bank's Pride Discounted Cash Flow Analysis: the calculation of Pride's weighted average cost of capital***.  In the description of Deutsche Bank's Discounted Cash Flow Analysis on pages 74 of the S-4, the S-4 fails to disclose Deutsche Bank's calculation of Pride's estimated weighted average cost of capital.  Because the Discounted Cash Flow Analysis is very

- 20 -

sensitive to the discount rates selected which are based on Deutsche Bank's estimate of the weighted average cost of capital, this information is critical to shareholders' understanding of how the analysis was performed and what, if any, weight to place on Deutsche Bank's Discounted Cash Flow analysis in determining whether to vote for the transaction.

66.     ***Goldman Sachs's Selected Companies Analysis: summary statistics and observed multiples for each company***.  In the discussion of Goldman Sachs's Selected Companies Analysis on pages 79 and 80, the S-4 fails to disclose: (i) the summary statistics for each comparable company; and (ii) the observed multiples for each company used in the Selected Companies Analysis.  This information is material because without the information set forth above, shareholders are unable to independently assess whether Goldman Sachs's analysis as set forth in the S-4 is an adequate measure of commonly used valuation measurements of the Company compared to the companies that Goldman Sachs selected.

67.     ***Goldman Sachs's Implied Present Value of Future Share Price Analysis: the basis for selection of assumed enterprise value to forward year EBITDA multiple range of 4.0x to 12.0x and the calculation of Pride's cost of equity***.  In the discussion of Goldman Sachs's Implied Present Value of Future Share Price Analysis on pages 80 and 81, the S-4 fails to disclose: (i) the basis for selection of assumed enterprise value to forward year EBITDA multiple range of 4.0x to 12.0x; and (ii) the calculation of Pride's cost of equity.  Without the information set forth above, shareholders are unable to independently assess whether Goldman Sachs's analysis as set forth in the S-4 is an adequate indicator of future value.

68.     ***Goldman Sachs's Relative Discounted Cash Flow Analysis: the calculation of Pride's and Ensco's weighted average cost of capital and the calculation of terminal multiples for Pride and Ensco***.  In the description of Goldman Sachs's Relative Discounted Cash Flow Analysis on pages 74 and 75 of the S-4, defendants omit Goldman Sachs's calculation of: (i) Pride's and Ensco's weighted average cost of capital; and (ii) the calculation of terminal multiples for Pride and Ensco.  Without the information set forth above, shareholders are unable to assess whether the

analysis was performed properly, and in turn, what weight, if any, to place on Goldman Sachs's fairness opinion.

69.     ***Goldman Sachs's Accretion/Dilution Analysis: the basis for Pride management's estimate of pre-tax synergies of $24 million and $98 million in 2011 and 2012, respectively***.  The S-4 fails to disclose why Pride's management estimated pre-tax synergies of $24 million and $98 million in 2011 and 2012, respectively, on pages 82 and 83 of the S-4.  The failure to disclose this information about the basis for Pride's management's estimate prevents the shareholders from evaluating the value Pride is adding to the go-forward prospects for the combined company and, thus, whether the Proposed Acquisition provides the shareholders with consideration that reflects this added value.  Defendants' failure to disclose this information renders the section of the S-4 that discusses the opinion of the Board's financial advisors materially misleading.

70.     ***The amount of compensation Goldman Sachs has received from Ensco for investment banking services rendered in the last two years***.  The S-4 fails to disclose the compensation paid by Ensco for the services rendered on its behalf over the past two years by Goldman Sachs.  The failure to disclose this information prevents the shareholders from properly considering whether Goldman Sachs was conflicted by virtue of having a greater financial interest to favor Ensco in the transaction based on their past dealings.  This information is vital for Pride shareholders to determine if Goldman Sachs's objectivity may have been compromised, and in turn, what weight, if any, to place on Goldman Sachs's fairness opinion.

71.     The Individual Defendants were aware of their duty to disclose the foregoing material information in the S-4, and acted with at least negligence in failing to ensure that this material information was disclosed in the S-4.  Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition, and are, thus, threatened with irreparable harm.

### THE UNFAIR AND INADEQUATE PROCESS

72.     In order to meet their fiduciary duties, the Individual Defendants are obligated to explore transactions that will maximize shareholder value, and not structure a preferential deal for

themselves.  Due to the Individual Defendants' eagerness to enter into a transaction with Ensco, they failed to implement a process to obtain the maximum value for Pride shareholders.

73.     As a result of defendants' conduct, Pride's public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  The consideration reflected in the Proposed Acquisition does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors and officers of Pride, and Ensco at the time the Proposed Acquisition was announced.

## SELF-DEALING

74.     Because the Individual Defendants dominate and control the business and corporate affairs of Pride and have access to material, non-public information concerning Pride's financial condition and business prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Pride.  Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best reasonable shareholder value.  Nonetheless, instead of attempting to negotiate a contract reflecting the best consideration reasonably available for the Pride shareholders who they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives.  Indeed, the Individual Defendants negotiated the Proposed Acquisition so that two directors would retain their position on the board of directors of the go-forward company.

75.     The proposed sale is wrongful, unfair, and harmful to Pride's public shareholders, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class (as defined herein) members.  Specifically, defendants are attempting to deny plaintiff and the Class their shareholder rights via the sale of Pride on terms that do not adequately value the Company.  Accordingly, the Proposed Acquisition will benefit defendants and Ensco at the expense of Pride shareholders.

- 23 -

76.     Rather than let the shareholders of Pride benefit from its improving financial performance, the Individual Defendants are seeking to sell the Company for their own benefit. By attempting to sell the Company, certain Individual Defendants are trying to extinguish the significant liability and exposure they face in the derivative actions.

77.     In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the sale of Pride and allow the shares to trade freely without impediments - including the termination fee;

- Act independently so that the interests of Pride's public shareholders will be protected; and

- Adequately ensure that no conflicts of interest exist between Individual Defendants' own interests and their fiduciary obligation to maximize shareholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Pride's public shareholders.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff brings this action on its own behalf and as a class action on behalf of all holders of Pride stock who are being and will be harmed by defendants' actions described herein (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

79.     This action is properly maintainable as a class action.

80.     The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, there were more than 176.8 million shares of Pride common stock outstanding as of February 2, 2011.

81.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

(a)      whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)      whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)      whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best value reasonably available under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(d)      whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Pride;

(e)      whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, honesty, and fair dealing;

(f)      whether the Individual Defendants have breached their fiduciary duty of candor to plaintiff and the other members of the Class in connection with the Proposed Acquisition by soliciting shareholder vote in favor of the Proposed Acquisition contract based upon inadequate disclosures;

(g)      whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(h)      whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(i)      whether Pride, Ensco, Ensco Ventures, or Ensco International have aided and abetted the Individual Defendants in breaching their fiduciary duties.

82.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

83.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

84.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

85.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

86.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against the Individual Defendants, Pride, and Ensco for Violations of §14(a) of the Exchange Act and SEC Rule 14a 9 Promulgated Thereunder

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     Individual Defendants, Pride, and Ensco disseminated the false and misleading S-4 specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     The S-4 was prepared, reviewed, and/or disseminated by the Individual Defendants, Pride, and Ensco.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

90.     In so doing, the Individual Defendants, Pride, and Ensco made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated

thereunder.  By virtue of their positions within the Company, the Individual Defendants, Pride, and Ensco were aware of this information and of their duty to disclose this information in the S-4.

91.     The Individual Defendants, Pride, and Ensco were at least negligent in filing the S-4 with these materially false and misleading statements.

92.     The omissions and false and misleading statements in the S-4 are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to shareholders.

93.     By reason of the foregoing, the Individual Defendants, Pride, and Ensco have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

94.     Because of the false and misleading statements in the S-4, plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants and Pride for
### Violation of §20(a) of the Exchange Act

95.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of Pride within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Pride, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends is false and misleading.

97.     Each of the Individual Defendants and Pride was provided with or had unlimited access to copies of the S-4 and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were, thus, directly involved in the making of this document.

99.     Pride also had direct supervisory control over composition of the S-4 and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the S-4.  Pride, in fact, disseminated the S-4 and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading S-4 to be published to shareholders.

100.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants and Pride were each involved in negotiating, reviewing, and approving the Proposed Acquisition.  The S-4 purports to describe the various issues and information that they reviewed and considered, descriptions which had input from both the directors and Pride.

101.    By virtue of the foregoing, the Individual Defendants and Pride have violated §20(a) of the Exchange Act.

102.    As set forth above, the Individual Defendants and Pride had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Pride will be irreparably harmed.

- 28 -

## COUNT III

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

104.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Pride and have acted to put their personal interests ahead of the interests of Pride's shareholders.

105.    By the acts, transactions, and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value inherent in and arising from Pride.

106.    The Individual Defendants have violated their fiduciary duties by entering Pride into the Proposed Acquisition without regard to the effect of the proposed transaction on Pride's shareholders.

107.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of Pride because, among other reasons:

        (a)    they failed to take steps to maximize the value of Pride to its public shareholders;

        (b)    they failed to properly value Pride and its various assets and operations; and

        (c)    they ignored or did not protect against the numerous conflicts of interest resulting from the Individual Defendants' own interrelationships or connection with the Proposed Acquisition.

108.    Because the Individual Defendants dominate and control the business and corporate affairs of Pride, have access to private, corporate information concerning Pride's assets, business, and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Pride which makes it inherently unfair for them to

pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing shareholder value.

109.     By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

110.     The Individual Defendants are engaging in self-dealing, are not acting in good faith toward plaintiff and the other members of the Class, and have breached and are breaching their fiduciary duties to the members of the Class.

111.     As a result of the Individual Defendants' unlawful actions, plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Pride's assets and operations.   Unless the Proposed Acquisition is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

112.     Plaintiff and the members of the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

**COUNT IV**

**Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Pride**

113.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

114.     The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

115.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

- 30 -

116.    Pride colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and was an active and knowing participant in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

117.    Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

### COUNT V

### Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Ensco, Ensco Ventures, and Ensco International

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

119.    The Individual Defendants owed to plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

120.    By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to plaintiff and the members of the Class.

121.    Ensco, Ensco Ventures, and Ensco International colluded in or aided and abetted the Individual Defendants' breaches of fiduciary duties, and were active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to plaintiff and the members of the Class.

122.    Ensco, Ensco Ventures, and Ensco International participated in the breaches of fiduciary duties by the Individual Defendants for the purpose of advancing their own interests. Ensco, Ensco Ventures, and Ensco International obtained and will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendant's breaches. Ensco, Ensco Ventures, and Ensco International will benefit, inter alia, from the acquisition of the Company at an inadequate and unfair consideration if the Proposed Acquisition is consummated.

123.    Plaintiff and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Proposed Acquisition agreement was entered into in breach of the fiduciary duties of Individual Defendants and is therefore unlawful and unenforceable;

C.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process  reasonably designed to enter into a merger agreement providing the best possible value for shareholders;

D.     Directing defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for Pride and obtain a transaction which is in the best interests of Pride's shareholders;

E.     Rescinding, to the extent already implemented any agreement to consummate the Proposed Acquisition;

F.     Imposition of a constructive trust, in favor of plaintiff and members of the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

G.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 8, 2011               FEDERMAN & SHERWOOD

/s/William B. Federman
William B. Federman, TBA #00794935
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
-and-
2926 Maple Avenue, Suite 200
Dallas, Texas 75201
wbf@federmanlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ARSHAN AMIRI
JUSTIN D. RIEGER
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
soddo@robbinsumeda.com
aamiri@robbinsumeda.com
jrieger@robbinsumeda.com

Attorneys for Plaintiff